# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 8:05CR387 |
| | ) | |
| DARTAVIAN WATSON, | ) | REPORT AND RECOMMENDATION |
| BILLY DEE SPENCER, and | ) | |
| JUAN ANTONIO GARCIA, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the following motions:

- MOTION TO SUPPRESS EVIDENCE (#25) filed by Dartavian Watson

- MOTION TO SUPPRESS ARREST, STATEMENT AND PHYSICAL EVIDENCE (#27) filed by Billy Dee Spencer

- MOTION TO SUPPRESS (#29) filed by Juan Antonio Garcia

Defendant Watson, the driver of a rented Dodge Magnum, seeks the suppression of physical evidence and statements obtained from him on September 30, 2005. Specifically, Watson challenges the search of his vehicle and the seizure of property, alleging that a warrantless search of his vehicle was conducted in violation of his rights against unreasonable searches and seizures as secured by the Fourth Amendment to the United States Constitution. He also alleges that any statements made by him should be suppressed as fruits of the unlawful search.

Defendants Spencer and Garcia were passengers in the Magnum. They contend that all evidence and statements should be suppressed because the vehicle was illegally stopped and searched, and they were illegally detained after officers searched the vehicle.

The government agrees the vehicle was not stopped for a traffic violation, but argues that a consensual encounter occurred. The government further argues that, even assuming Watson and the other defendants were illegally detained, Watson's consent to search the vehicle was voluntarily given. The government further contends that Spencer and Garcia lack standing to object to Watson's consent to search the vehicle.

Hearing on the motion was held January 27, 2006, the transcript of the hearing (#37) was filed on February 1, 2006, and the matter was deemed submitted on March 2, 2006, following the filing of post-hearing briefs.

## FACTUAL BACKGROUND

Gregory Goltz testified he is an 18-year employee of the Nebraska State Patrol currently assigned as a trooper to road operations in the uniform division. He patrols county, state, and federal highways within the boundaries of the state of Nebraska (6:6-14). In addition to 18 years of experience, he has received over 400 hours of training in traffic stops, detecting suspicion, looking for hidden compartments, and search and seizure issues.[1]

Goltz testified that on September 30, 2005 he was conducting a law enforcement action on Interstate 80 near the Giltner interchange, Exit 324, 12 miles east of Grand Island. He was driving a marked Nebraska State Patrol cruiser (39:9-12) and had a weapon on his side (43:3-8).

As part of the enforcement action, six signs were placed on the shoulders and medians visible to eastbound traffic. The signs stated that a drug dog and a vehicle

---

[1] Exhibit 1 is a synopsis and resume of all drug and criminal training received by Goltz and a list of training he has conducted as a teacher throughout the country.

checkpoint were ahead. The signage information was essentially a ruse, as there was no dog or checkpoint (8:17-9:8). Goltz had conducted this type of action approximately 50 times before September 30, 2005 on the hope that when drivers saw the sign, they would use an exit ramp off the interstate and commit some illegal activity. If such a violation occurs, officers stop the vehicle and many times make arrests (10:22-11:6). During previous enforcement actions, Goltz has made 381 contacts, 147 of whom were not searched and 234 of whom were arrested or cited (Exhibit 4) (11:18-12:11). Goltz noted that Exit 324 is a clear interchange with no amenities and no sign for eastbound traffic stating that gas or amenities are present (11:7-14). The exchange connects Interstate 80 with State Spur 41-B, the Giltner spur (Ex.2).

  Goltz testified that on September 30, 2005 while he was stopped on the Giltner spur, one-half mile south of I-80 with a violator, he noticed a cream-colored Dodge Magnum with California plates travel south on the Giltner spur. Three to four minutes later, he observed the same Dodge Magnum proceed back northbound. As he had completed his contact with the violator, Goltz re-entered his cruiser and proceeded north on Highway 41-B. He caught up with the Magnum as it turned into a farm lane (17:10-18:19) and observed as the Magnum drove 200-300 feet from the highway and stopped in front of the garage of a house. There is a large paved parking lot located to the east of the house. (20:1-5). Goltz noted he knew the owners of the house based on past contacts, and he was aware that no one at the residence had a Dodge Magnum (19:5-20:8). Goltz testified the house had been listed for sale during the summer of 2005, and the owner told Goltz several times that he wanted to make sure law enforcement kept an eye on the house because several times arrests had been made in the area.

Goltz drove his cruiser to a position behind the Dodge Magnum and activated his in-car camera.[2] Goltz observed as one subject exited the passenger door and walked towards the residence. Goltz exited his cruiser, approached the subject, and asked him if he was lost. The subject stated that he was looking for gas. Goltz asked who the car belonged to, and the subject stated it was a rental car. Goltz asked if the person who rented the car was in the vehicle. The subject responded yes, that it was Dartavian. Goltz then approached the driver's side of the Magnum and asked the driver, who was later identified as defendant Dartavian Watson, why he was there. Watson informed him that they were looking for gas. Goltz asked where they were headed and Watson responded Des Moines. Goltz then asked Watson for his paperwork and identification. The identification identified the driver as Dartavian Watson of California, and the rental agreement disclosed that the Magnum had been rented in California (21:6-22:2).

Goltz testified he asked Watson to come back to his vehicle so he could talk with him. Once in the vehicle, he again asked Watson where he was heading and Watson stated Milwaukee. When Goltz asked him why he had earlier said Des Moines, Watson stated they had to drive through Des Moines to get to Milwaukee. Goltz asked Wilson why they were trying to get gas at the farm house. Watson explained that he had gone south but couldn't locate gas in Giltner, or could not find the town of Giltner, which was about three miles away, because all the roads were gravel or dirt. (44:12). Goltz explained that there is a gas station in Giltner (22:13-23:2).

---

[2]Exhibit 3 is a videotape which contains the remainder of Trooper Goltz's contact with the defendants at the farm house.

Goltz testified he then ran all three individuals through state patrol dispatch and while waiting for the information, exited his cruiser to talk to the passengers in the car, who he later identified as Juan Antonio Garcia and Billy Dee Spencer. After determining Garcia had a California driver's license and Spencer had a Wisconsin driver's license or ID card, he asked them why they were there. They responded that they were trying to find gas. When he asked where they were ultimately heading, they responded Wisconsin–to take Spencer back home (23:8-21).

Goltz testified that he then returned to his cruiser to again talk to Watson about helping Spencer move from Wisconsin to California (24:4-9). Because Goltz believed this was a discrepancy, he asked Watson in detail about the trip. Watson responded they were driving back to Wisconsin because Spencer was moving to California where he had rented an apartment. When Goltz asked Watson why he did not get gas in Giltner, Watson tried to convince him that there was nothing in Giltner but dirt roads. Goltz again assured Watson that all the roads were paved except maybe one. Goltz thought Watson's story was suspicious and he was also suspicious that Watson would not look him in the eyes when talking about the trip (24:23-25:6).

Goltz testified that after he ran the three names through dispatch, he learned that there were several warrants under the name Juan Garcia, so he asked Garcia for his social security number. After re-running the information with Garcia's social security number, he determined that the Juan Garcia in the Magnum was not wanted (25:7-16).

Goltz testified that from dispatch he found out that Watson had been arrested for drug violations, so he asked Watson about his prior arrests. Watson became nervous and put his hand over his mouth and mumbled that he had been arrested once as a juvenile

for "some counterfeit bills." Goltz asked Watson if he had been arrested for anything else. Watson responded no (25:25-26:5).

Goltz testified that after he determined the three individuals were not wanted, he returned Watson's documents and explained to him that "in his history he had seen a lot of weird things on the interstate" and he asked Watson if he had any marijuana, cocaine, crack, or weapons in the Magnum. Watson responded that he had none (26:6-24). Goltz then asked if Watson had any problems if he searched the vehicle, and Watson replied, "What do you want to do?" Goltz asked him if he had any drugs in the vehicle. Watson responded "no." Goltz asked, "So I can search the vehicle?" and Watson said, "Go ahead."[3] Goltz stated, "then I can search the vehicle?" Watson responded, "go ahead" (26:7-20). Goltz testified that he made no threat or promise to Watson and that at the time Watson consented he was not in custody (26:21-27:2).

On cross-examination, Goltz elaborated on the factors giving rise to his suspicions that the defendants were involved in some kind of criminal activity. He testified that he initially "had a hunch that this vehicle had exited because of the signs, beings that it was a California plate." (50:10-11). Their vehicle, which was an out-of-state vehicle, went south for a minute or two and then turned around. In his experience at this interchange, the traffic that turns south continues going south, even out-of-state vehicles, to get gas or something. Furthermore, "Giltner is a town that you cannot miss. There is no way you can miss the town of Giltner." (51:3-4). Knowing that this vehicle turned around before

---

[3]The videotape (Exhibit 3) discloses the following at 1332 after Goltz asks for permission to search. Watson: "What did we do?" Goltz: "What do you mean, 'what did we do?' You're saying there is nothing illegal in the car. Can I search the car?" Watson: "Go ahead."

reaching Giltner and pulled into the residence caused Goltz to become more suspicious based on the number of arrests he had made there. Goltz noted that the defendants could have purchased gasoline about 12 miles back at a large interchange near Grand Island. Also, "Mr. Watson was trying to tell me that the town of Giltner didn't even have a paved road, which I knew is not true." (52:11-13). Goltz testified why his suspicions became heightened as he talked to the defendants:

> The very nervous behavior by Mr. Watson. The conversation that Mr. Spencer has given me in which he has stated he's heading home, and Mr. Garcia has stated they are driving him home. Mr. Watson labeling out they are actually moving Mr. Spencer to California. That they are actually going to drive all the way to Wisconsin, pick up Mr. Spencer's items in a truck, and then drive that back with this rental car. The rental car was due back within a day or two.

(54:8-15). Had Watson not consented to the search of the vehicle, Goltz would have detained the three individuals and called for a service dog. (54:17-21).

Before searching the Magnum, Goltz asked Spencer and Garcia to go back to the patrol car, where he patted them down for safety reasons. He had Spencer sit in the back seat. Garcia was standing in the open door of the back seat. All three defendants were together, in or near the cruiser. Goltz took the keys to the cruiser and proceeded up to the Dodge Magnum. He then searched the Magnum and located a cardboard box in the rear of the vehicle containing eight kilograms of cocaine (27:23-28:5).[4] None of the defendants at any time asked Goltz to stop searching the vehicle or asked any questions while Goltz

---

[4]Exhibit 3, the videotape of the contact, shows that Goltz first approached the Magnum at 1318, Watson entered Goltz's cruiser at 1319 and granted permission to search at 1326. The drugs were located at 1339.

was searching (30:14-19). After finding the cocaine, Goltz placed all three individuals under arrest. (28:3-5).

On cross-examination Goltz testified that he followed the Magnum because he wanted to know if the vehicle had anything to do with criminal activity (36:3-8) and not because he had observed any law violations (36:9-11). He also noted that as he pulled up behind the Magnum, Garcia (one of the passengers) was exiting the vehicle (37:7-11).

Goltz admitted that when he asked Watson to sit in the cruiser, he had Watson's driver's license and rental agreement (38:12-20) and never informed Watson that he didn't have to come back to the cruiser (39:13-15). Goltz admitted that both Watson and Garcia told him that they were looking for gas and that when he checked the gas gauge, it indicated the Magnum was very low on gas (41:1-9).

Goltz admitted that prior to Watson consenting to the search, he did not inform him that he had a right to refuse (41:18-22), nor did he tell Watson that he was free to exit the patrol car and go on his way if he wanted to (41:23-42:1). Goltz admitted that his cruiser was parked close enough to the Magnum and the Magnum was close enough to the garage that it could not have been driven away (42:22-43:2). Goltz stated that the only person he asked for consent to search was Watson (46:2-4).

On redirect examination, Goltz testified that he brought Watson back to his cruiser because he was the renter and driver of the vehicle, and because Goltz wanted to find out why he was at the farm house (55:2-7).

## LEGAL ANALYSIS

### A. Legality of Detention

During oral argument, counsel for the United States identified the threshold issue in this case as whether Trooper Goltz had reasonable suspicion to conduct an "investigative detention" in this instance. Goltz did not actually stop the vehicle, as no traffic violation had occurred, but initially approached the defendants to investigate their presence at the farmstead.

In Fourth Amendment analysis, an investigative detention is a seizure of limited scope and duration which must be supported by a reasonable articulable suspicion of criminal activity, *see, e.g., Terry v. Ohio*, 392 U.S. 1 (1968). In other words, police must have a "particularized and objective basis" for suspecting criminal activity at the time of an investigative detention. *United States v. Spotts*, 275 F.3d 714, 718 (8th Cir. 2002). This standard is "less demanding than the standard of probable cause that governs arrests and full-scale Fourth Amendment searches, both with respect to the amount of supporting information that is required to establish reasonable suspicion and with respect to the degree of reliability that the information must exhibit." *Id*. (citing *Alabama v. White*, 496 U.S. 325, 330 (1990)). "A reasonable suspicion may be justified even if there are innocent explanations for a defendant's behavior when the circumstances are considered in the totality." *United States v. Tuley*, 161 F.3d 513, 515 (8th Cir. 1999). In *United States v. Arvizu*, 534 U.S. 266, 273 (2002), the Supreme Court stated that reviewing courts must look at "the totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. "This process

allows officers to drawn on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.*

In this case, the Magnum was seen traveling back and forth, north and south, on the Giltner spur on a day when a "ruse" checkpoint warning was posted near the Giltner exit. Goltz decided to investigate the vehicle because it had out-of-state plates and pulled into a farm lane where the house had recently been put up for sale, and the owner had asked law enforcement to keep an eye on the property. I find that Trooper Goltz has articulated a "particularized and objective basis" to conduct a *Terry* stop and investigate the defendants' presence on the property.[5]

A *Terry* stop that is justified at its inception must also be sufficiently limited in scope and duration. *United States v. Ramires*, 307 F.3d 713 (8th Cir. 2002). The officer may conduct an investigation which is "'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001) (quoting *Terry*, 392 U.S. at 20). After the purpose of the *Terry* stop is completed, continued detention of the individuals is an unreasonable extension of the scope of the investigation unless something that occurred during the initial stop generated the necessary reasonable suspicion to justify further detention. *Id.* at 925.

> If reasonably related questions raise inconsistent answers, or if the licenses
> and registration do not check out, a trooper's suspicions may be raised so as

---

[5]Noting that the defendants drove past Goltz' patrol cruiser at least twice before pulling into the lane, I decline to infer that Watson was trying to avoid the cruiser by pulling into the farmhouse instead of the nearby parking lot. Nor is there any evidence that the vehicle was actually seen exiting the Interstate at the Giltner exit or that any of the defendants saw the ruse checkpoint notice.

> to enable him to expand the scope of the stop and ask additional, more intrusive, questions. If, however, no answers are inconsistent and no objective circumstances supply the trooper with additional suspicion, the trooper should not expand the scope of the stop.

*United States v. Ramos*, 42 F.3d 1160, 1163 (8th Cir. 1994), *cert. denied*, 514 U.S. 1134 (1995).

Here, in addition to his reasonable concern about a strange vehicle pulling into the farm lane, Goltz admittedly was acting on a "hunch" that the Magnum had exited the Interstate because of the ruse checkpoint signs, "beings that it was a California plate." He subsequently discovered that the rental documents were in order and there were no outstanding warrants for any of the individuals, although Watson had a criminal record. The three individuals gave consistent accounts of their travel between California and Milwaukee via Des Moines and all told him they were looking for a place to buy gasoline. Goltz verified that the Magnum was, in fact, very low on gas. Even crediting Goltz' observation that the defendants seemed nervous, and Goltz' disbelief of the defendants' statements that they could not find gas in Giltner–or even find the town of Giltner–because all the roads were gravel or dirt, I do not believe these factors constituted reasonable suspicion to justify further detention.

### B. Consent to Search

At the time Watson was asked for permission to search, the three individuals, while not formally arrested, were still being detained for investigation. In my opinion, for the reasons discussed above, continuing to detain the defendants was a violation of the Fourth Amendment. *See United States v. Ramos*, 42 F.3d at 1165. All the defendants may "challenge the stop and detention and argue that the evidence should be suppressed as

fruits of illegal activity." *United States v. Lyton*, 161 F.3d 1168, 1170 (8th Cir. 1998); *accord United States v. Ameling*, 328 F.3d 443, 447 n.3 (8th Cir.), *cert. denied*, 540 U.S. 961 (2003).

Statements and evidence resulting from an illegal detention are not admissible. *United States v. Ramos*, 42 F.3d at 1164 (citing *Wong Sun v. United States,* 371 U.S. 471 (1963)). If the illegal detention had never taken place and the defendants had been sent on their way after the initial inquiry, the request to consent would not have occurred. It is, however, possible for the causal chain between an illegal detention and evidence discovered pursuant thereto to be broken. In *Ramos*, the court held that the causal chain between an illegal detention and a consent to search was, in fact, broken:

> [C]ontinuing to detain the defendants after their licenses and registration had been checked was a violation of the Fourth Amendment. We assume for present purposes that Salvador did not feel free to leave even after his driver's license had been handed back to him, and that this feeling on his part was reasonable under all the circumstances. We think it clear that his written consent was a result of the illegal detention in a "but for" sense. If the illegal detention had never taken place, if he had been sent on his way after the document check had been properly concluded, the subsequent conversation, including the offering of the consent form, would not have occurred. But, under *Brown v. Illinois*, [422 U.S. 590, 602 (1975)], that is not the end of the matter. The further question is whether Salvador's consent, found to be voluntary by the District Court, was "sufficiently an act of free will to purge the primary taint." *Wong Sun, supra,* 371 U.S. at 486, 83 S.Ct. at 416-17. On this record, we think the answer is yes. The officer told Salvador, both orally and in writing, that he did not have to sign the consent form. Such a warning is not required by law, *Schneckloth v. Bustamonte,* 412 U.S. 218 (1973), and so the fact that the officer gave it indicates rather strongly to us that he was not attempting to exploit an illegal situation. The arrest and consent were close in time, and there were no intervening circumstances, but the officer's conduct was in good faith, and the violation of *Terry* was not flagrant. What happened here, really, went beyond voluntary consent. It was an **affirmative waiver** of Salvador Ramos's Fourth Amendment right to prevent a search of his vehicle.

>Accordingly, we hold that Salvador Ramos's voluntarily signing the consent form was sufficiently an act of free will to purge the taint of the preceding illegal detention. Therefore, the evidence discovered by the consented-to search was not made inadmissible by the Fourth Amendment.

*United States v. Ramos*, 42 F.3d at 1164 (emphasis added)(parallel citations omitted).

In the case at bar, the government bears the burden of proving that Watson's consent was an act of free will sufficient to purge the primary taint. In making this determination, the court should consider the temporal proximity of the events, the presence of intervening circumstances, whether *Miranda* warnings were given, whether the defendant was advised he had the right to refuse consent, and the purpose and flagrancy of the official misconduct. *See Ramos*, 42 F.3d at 1164. I conclude that the government has not met its burden.

Here, the officer did not generate reasonable grounds to continue to detain the defendants beyond investigating their presence on the farm premises. Although the rental papers and other documents had been returned to the defendants, their vehicle was blocked by the patrol cruiser to an extent that it could not be driven away without complex maneuvering. Trooper Goltz acknowledged that the defendants would not have been allowed to leave, and he would have called for a service dog, if Watson did not agree to the search. Watson was not told he was free to leave or that he could refuse consent. Under the circumstances, while not physically coerced, Watson's consent hardly rises to the level of any "affirmative waiver" of his Fourth Amendment right to prevent a search of the vehicle.

## RECOMMENDATION

Although Trooper Goltz had reasonable suspicion to investigate the defendants' presence on the farm premises, his initial investigation did not generate reasonable suspicion to justify further detention. Defendant Watson's consent to search the vehicle was the result of an illegal detention, and the government has not met its burden of proving that the causal chain between the illegal detention and Watson's consent to search was broken. Under these circumstances, all the defendants have standing to object to the search as fruits of illegal activity. For these reasons,

**IT IS RECOMMENDED**

1. That the MOTION TO SUPPRESS EVIDENCE (#25) filed by Dartavian Watson be granted;

2. That the MOTION TO SUPPRESS ARREST, STATEMENT AND PHYSICAL EVIDENCE (#27) filed by Billy Dee Spencer be granted; and

3. That the MOTION TO SUPPRESS (#29) filed by Juan Antonio Garcia be granted.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED March 27, 2006.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**